# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 57797-6-II |
| Respondent, | |
| v. | |
| TAYLOR TOM CONLEY, | UNPUBLISHED OPINION |
| Appellant. | |

VELJACIC, A.C.J. — Taylor Conley was convicted of aggravated murder in the first degree on June 11, 2008. He was sentenced to mandatory life in prison without the possibility of release or parole (LWOP) under RCW 10.95.030(1). He was 20 years old at the time of the crime. Following our Supreme Court's decision in *In re Personal Restraint of Monschke*, 197 Wn.2d 305, 482 P.3d 276 (2021), Conley, pursuant to CrR 7.8, moved to be resentenced. The resentencing court maintained Conley's LWOP sentence.

Conley raises several errors on appeal: (1) he argues that he was denied his right to be present at the hearing where the trial court considered whether he would be restrained at his resentencing hearing; (2) he asserts that he was unjustifiably required to wear a stun cuff at his resentencing hearing; (3) he maintains that discretionary LWOP under RCW 10.95.030(1) for young adults[1] between the ages 18 to 20 is unconstitutional under article 1, section 14 of the

---

[1] There are several terms used to describe 18-to-20-year-olds. They include late adolescents, young adults, and youthful offenders.

Washington State Constitution; (4) he argues that discretionary LWOP is also unconstitutional when a young adult exhibits the chance of rehabilitation; (5) he argues that the resentencing court failed to give adequate weight to his rehabilitative efforts while serving his sentence; (6) he alleges that the court erred by requiring Conley to prove mitigating factors to warrant a lesser sentence and failed to consider that it had the discretion to impose a sentence less than LWOP; and (7) he asserts that the court erred by not considering an indeterminate sentence.

We conclude that: (1) Conley did not have a right to be present at the restraint hearing, but even if he did, the issue was waived; (2) the court did not abuse its discretion by requiring Conley to wear the stun cuff at his resentencing hearing; (3) article 1, section 14 of the Washington State Constitution does not proscribe discretionary LWOP for young adults between the ages of 18 and 20; (4) article I, section 14 of the Washington State Constitution does not prohibit discretionary LWOP for young adults who exhibit the possibility of rehabilitation; (5) the court meaningfully considered the mitigating qualities of Conley's youth and rehabilitation when imposing its sentence; (6) the court did not err regarding the burden of proof because it considered the mitigating factors under two frameworks, one of which was correct; and (7) indeterminate sentences may not be imposed under RCW 10.95.030. We affirm Conley's sentence.

FACTS

I.      BACKGROUND[2]

On the morning of March 31, 2006, around 8:30 a.m., Conley and Ronald Weller-Childers (Childers) went to the home of Brian Swehla. They drove to Swehla's house in James Zebley's

---

[2] The record pertaining to the underlying facts of Conley's conviction are not in the record before this court. We rely on our unpublished opinion in *State v. Conley*, noted at 156 Wn. App. 1027 (2010) [hereinafter *Conley* I] and the summary of facts provided by the State and the resentencing court.

truck, which Conley had borrowed earlier that morning.[3]  Conley and Childers were armed with weapons previously stolen from Conley's father three days prior, including an old 12-gauge pellet shotgun, a .22 caliber automatic rifle, a Winchester semiautomatic .22 caliber firearm, and a Winchester 12-gauge shotgun.

The two broke into Swehla's home by kicking in a door to an attached garage.  Swehla was inside, and a struggle ensued.  While Swehla was running down a hall, Childers shot Swehla.  After being shot, Swehla crawled into a bedroom containing a large safe.  Conley and Childers tried to open the safe, but were unsuccessful.

In an apparent effort to get Swehla to open the safe, Conley and Childers struck Swehla several times with a jack handle.  They also strangled Swehla and hit him with brass knuckles.  Eventually, Conley forced Swehla to his knees and shot him in the back of his head.  Conley and Childers took several items from the home and left.

Conley returned to his mother's house with Childers around 10:30 a.m.  When Conley was returning the truck, Zebley observed guns rolled up in a blanket in the truck bed.  Conley warned Zebley that he "might not want the truck back because [Conley] had committed some burglaries with it."  Rep. of Proc. (RP) (Dec. 9, 2022) at 8.  Conley offered to purchase the truck, but Zebley declined.  Conley, still driving Zebley's truck, dropped off Zebley and Childers in Kelso.  Conley agreed to return the truck but never did.[4]

Conley attempted to get rid of the evidence connecting him to the crime.  He destroyed his clothing that he wore that day.  And investigators later found partially burned shotgun shell casings

---

[3] Conley invited Zebley to participate in the burglary, but Zebley declined the offer.

[4] Zebley found the truck abandoned on the side of the road three days later.

in a sauna furnace in an unattached outbuilding at Conley's mother's house. Conley also contacted Josh Derum, asking "whether he wanted to buy some stolen guns, one [Conley] described as a nickel-plated 12-guage shotgun." *State v. Conley* I, noted at 156 Wn. App. 1027, slip op. at 3 (2010). Derum explained that he was not interested. Conley responded that "he needed some money to get out of town because he just put a hole in somebody's head." *Id.*

Several days later, Conley contacted Derum again, offering to sell a pool table and a "Deuce," which Derum understood to mean a .22 caliber rifle. *Id.*, slip op. at 5. Then, Conley contacted Robert Courser, explaining that he had some items to sell and was trying to leave town because deputies had questioned him about a murder. Conley also mentioned that he "wanted to find [Childers] before the deputies found him" because he "had some . . . loose ends" to take care of. RP (Dec. 9, 2022) at 9. Childers was the only eyewitness to the death of Swehla.

Conley was eventually taken into custody and charged with aggravated murder in the first degree or, in the alternative, felony murder in the first degree. While in custody, Conley told several other inmates of what he had done, which was ultimately relayed to the police. Childers initially told police that Conley was the one with him on March 31, "but refused to name [Conley] in court." RP (Dec. 9, 2022) at 7. "Childers actually named someone else as his partner and subsequently pled guilty to [p]erjury in the [f]irst [d]egree for lying in court about who was with him" that day. RP (Dec. 9, 2022) at 7.

A jury found Conley guilty of aggravated murder in the first degree, and he was sentenced to mandatory LWOP pursuant to RCW 10.95.030. On the date of the crime, Conley was seven months away from turning 21. After our Supreme Court's decision in *Monschke*, 197 Wn.2d 305, Conley, pursuant to CrR 7.8, moved to be resentenced, which was granted.

4

II.   RESENTENCING

   A.   Restraint Hearing

On October 28, 2022, the court convened for Conley's resentencing hearing. Prior to Conley's arrival, the court addressed the jail's request to have Conley "brought over in restraints," which originally came to the court's attention through e-mail the day prior. RP (Oct. 28, 2022) at 3. The State had no preference either way and deferred to the individualized analysis required for restraining defendants. The State, however, said that it was "hard-pressed to point to an aggravated set of circumstances where [it] would advocate for restraints. RP (Oct. 28, 2022) at 4. Defense counsel requested that Conley "be allowed in the courtroom without restraints," noting that he had "been well behaved" at the Department of Corrections (DOC) and infraction free for four to five years. Defense counsel also explained that Conley was in "minimum custody at DOC, which [was] a really big event for an individual with a life without parole sentence." RP (Oct. 28, 2022) at 4.

After hearing from both sides, the court listed the variety of factors required in the individualized analysis to restrain a defendant.[5] The court emphasized that "courtroom safety [was] of the upmost concern." RP (Oct. 28, 2022) at 5. The court also noted that Conley was "found guilty of Aggravated Murder in the First Degree," was in minimum custody, and his last infraction at DOC was on September 15, 2017. RP (Oct. 28, 2022) at 5. The court, however, later

---

[5] The court referenced the factors articulated in *State v. Hartzog*, 96 Wn.2d 383, 400, 635 P.2d 694 (1981):

> [S]eriousness of the present charge, the Defendant's temperament and character, his age and physical attributes, his past record, past escapes or attempted escapes, threat to harm, self-destructive tendencies, risk of mob violence, possibility of rescue by other offenders, the size and mood of the audience, the nature of physical security of the courtroom, and adequacy and availability of alternative remedies.

RP (Oct. 28, 2022) at 5.

explained that there was "a very packed courtroom, and that [was] of concern in-as far as safety." RP (Oct. 28, 2022) at 6.

The court concluded that it was not going to "require the full shackles," but was going to require Conley to wear a stun cuff. RP (Oct. 28, 2022) at 6. The basis for the court's decision was based primarily on the fact that the courtroom was small and there were many people in attendance for the hearing. At no point did defense counsel object to Conley's absence at this hearing.[6]

B.    Resentencing Hearing

At the resentencing hearing, defense counsel, for the first time, explained that the RCW 10.95.030(1), the applicable statute for aggravated murder in the first degree, existed outside the Sentencing Reform Act of 1981. And because there was no standard range for the offense, the court could apparently "impose some determinate sentence anywhere from zero days or . . . an indeterminate sentence of life in prison with [the] possibility of parole." RP (Oct. 28, 2022) at 11. As a result, Conley did not have the burden "to show mitigating circumstances to go below the standard sentencing range, because the standard sentencing range [did] not exist." RP (Oct. 28, 2022) at 11. The State did not agree with Conley's understanding of RCW 10.95.030, explaining that the defendant bore "the burden of showing by a preponderance of the evidence that . . . there is a substantial and compelling reason to justify a sentence other than [LWOP,] the sentence that the legislature required." RP (Oct. 28, 2022) at 13. The court did not address the issue at that time and required additional briefing on the issue.

After discussing the matter with counsel, the court proceeded to hear victim statements from several individuals. Then, defense counsel called Dr. Megan Carter, a forensic psychologist, to testify. On direct examination, Dr. Carter explained the underlying science behind brain

---

[6] Neither Conley nor defense counsel objected to his absence at the resentencing hearing.

development in adolescents and young adults. And based on the information provided to Carter, she concluded that at the time off the offense, Conley "was functioning at a less developed, less mature level than others would expect."[7] RP (Oct. 28, 2022) at 31. This was based, in part, on Conley's history of child maltreatment, substance abuse, mental health problems, and negative influence by his peers.

On cross-examination, the State inquired into Dr. Carter's familiarity with the underlying facts of the case. Dr. Carter explained she believed that she reviewed the sentencing transcript. Dr. Carter, however, was unsure whether she had reviewed any other materials, such as the police reports, trial transcript, victim statements, crime scene photos. When the State asked whether Dr. Carter, when interviewing Conley, delved into "his conduct in committing the offense," Dr. Carter replied, "I did not." RP (Oct. 28, 2022) at 40. And when talking about the youthfulness factors and how they applied to the case, this exchange took place:

> Q: . . . And you don't have any information from the evidence adduced at trial that [Conley] succumbed to some sort of peer pressure in committing this particular crime.
> A: I don't know that I can speak to that. Again, I didn't ask [Conley] directly about the circumstances, and I don't recall that specific information from the court proceeding transcripts that I had.

---

[7] In Carter's report, she explained that,

> [A]s a result of [Conley's] overall mental condition (e.g., dysmaturity, significant substance abuse that contributed to poor mental health, exposure to childhood maltreatment, etc.), Mr. Conley's capacity to fully appreciate the consequences of his choices and conduct was likely significantly impaired during the time of the alleged offenses, based on the known course of brain development and his exposure to adverse childhood experiences.

Clerk's Papers (CP) at 48.

RP (Oct. 28, 2022) at 45.  On redirect, Dr. Carter noted that when conducting an analysis on an individual's behavior, they generally "focus on . . . an overall functioning assessment, not necessarily . . . any one moment."  RP (Oct. 28, 2022) at 47-48.

After Dr. Carter's testimony, the court heard from several witnesses about Conley, his rehabilitative efforts during confinement, and the positive impact Conley had on their lives. Conley's wife, for example, testified how Conley was heavily involved with social programs organized through the prison and that he started his own social enterprise, helping people who are currently or formerly incarcerated.  And when Conley himself testified, he expressed remorse, emphasizing that he could not reverse his actions, but he could help others avoid making the same mistakes in the future.

Following testimony from all of the parties' witnesses, the court heard closing arguments. Defense counsel argued that Conley's youthfulness, substance abuse, and exposure to a "criminal lifestyle at a very young age" diminished "[h]is capacity to fully appreciate the consequences of his choices . . . during the time of the offense."  RP (Oct. 28, 2022) at 90.  Defense counsel then requested the court to impose a sentence of 16 1/2 years in custody.

During the State's closing argument, the State noted that Conley submitted a personal restraint petition (PRP) two years earlier where Conley "emphatically asserted that he was not guilty."  RP (Oct. 28, 2022) at 96.  The State explained that it was referencing the PRP solely to illustrate the stark contrast between Conley's outlook at that time and resentencing.  Then, the State focused on the burden of proof regarding mitigating factors, reiterating that Conley had the burden to show a mitigating factor beyond a preponderance of the evidence.  The State went on to summarize the underlying facts of the case, arguing that the "hallmark features of youth . . . immaturity, impetuosity, and failure to appreciate risks and consequences" did not affect Conley's

behavior on the day of the offense. RP (Oct. 28, 2022) at 106. Ultimately, the State requested that the court "maintain the original sentence of life without parole." RP (Oct. 28, 2022) at 115.

### C.    Resentencing Court's Decision

On December 9, 2022, the court reconvened to announce its resentencing decision. Before announcing its decision, the court noted the various factors that must be taken into consideration at a *Monschke* resentencing.[8]    The court then acknowledged Conley's troubled childhood, referencing his substance abuse and maltreatment.

Turning to Dr. Carter's report, the court took issue with Dr. Carter "not knowing much in the way of the facts of the case." RP (Dec. 9, 2022) at 6.    The court went onto explain that this was of "major concern" to the court because it was "of upmost . . . importance to look at the actions of a defendant at the time of the commission of a crime. That time is important to know and understand how [Conley] was functioning at that point in time." RP (Dec. 9, 2022) at 6.

After summarizing the underlying facts of the crime, the court addressed the burden of proof issue regarding mitigating circumstances. The court concluded that "it is well-established and no supporting law is contrary to such that preponderance of the evidence applies to consideration of mitigation of a sentence." RP (Dec. 9, 2022) at 11. As a result, Conley had "to meet preponderance of the evidence to show a basis to mitigate the . . . sentence." RP (Dec. 9, 2022) at 15.

---

[8] The court recognized it must consider factors "related to the Defendant's youth, including age and its hallmark features such as the juvenile's immaturity, impetuosity, and failure to appreciate risk and consequences," as well as "the nature of the juvenile's surrounding environment and family circumstances, the extent of the juvenile's participation in the crime, the way familial and peer pressure may have affected him, and how youth impacted any legal defense, along with any factors suggesting there might be successful rehabilitation." RP (Dec. 9, 2022) at 4-5.

9

The court then turned to "the three general differences between juveniles under 18 and adults identified in *Monschke*." RP (Dec. 9, 2022) at 11. The court acknowledged that Conley was 20 years and 5 months old at the time of the offense, "seven months short of his 21st birthday." RP (Dec. 9, 2022) at 11. With respect to "[i]petuosity and [the] extent of participation," the court reasoned that this factor was not applicable as Conley's behavior was "an intentional, deliberate act." RP (Dec. 9, 2022) at 11-12. The court referenced the fact that the crime was "a planned-out attack over three days," and there was "no showing of peer pressure."[9] RP (Dec. 9, 2022) at 12. Additionally, the court reasoned that Conley's independence was supported through his actions "after the murder when [Conley was] trying to get out of town" and expressing his intent to "clean up the loose end, meaning Childers." RP (Dec. 9, 2022) at 12.

Next, the court addressed "risk and consequences." RP (Dec. 9, 2022) at 12. The court determined that this factor was also inapplicable, noting that there was "no question . . . [that Conley] knew the risk and consequences . . . at the time or future consequences." RP (Dec. 9, 2022) at 13. This was based on Conley's actions where he tried to "get money to get out of town" and destroy the evidence connecting him to the crime. RP (Dec. 9, 2022) at 13.

The court did not find any mitigating factors related to legal defense and then turned to rehabilitation. The court noted that while the "majority of the testimony and supporting statements [spoke] to the rehabilitation of [Conley]," it could not "ignore . . . that at the time of [his original] sentencing[, Conley] denied any responsibility for the murder." RP (Dec. 9, 2022) at 14-15. The court focused on the fact that Conley also denied responsibility in the PRP filed two years earlier, which raised questions about his sincerity. To that end, the court stated, "Does the Court see

---

[9] The court explained that "Childers . . . would not shoot Swehla, but it was [Conley] that stepped in." RP (Dec. 9, 2022) at 12.

[Conley] appears to be doing positive things as he has naturally matured?  No doubt.  But, the Court cannot find he is rehabilitated."  RP (Dec. 9, 2022) at 15.

Turning back to the burden of proof issue, the court concluded that Conley did not demonstrate "by a preponderance [of the evidence] that his crime reflect[ed] the mitigating qualities of youth."  RP (Dec. 9, 2022) at 15-16.  As a result, the court held that there was "no substantial and compelling reason[] to justify an exceptional sentence."  RP (Dec. 9, 2022) at 16.  Alternatively, the court also explained that "[e]ven if it was just the consideration of mitigating factors, the Court" would still have found "no basis when considering all the various factors to mitigate the sentence."  RP (Dec. 9, 2022) at 16.  This was also reflected in the court's findings of fact and conclusions of law.  There, the court explained:

> 3. [Conley] has not demonstrated by a preponderance of the evidence that his crime reflects the mitigating qualities of youth.  Additionally, there are no substantial and compelling reasons to justify an exceptional sentence.
> 4. Whether by preponderance of the evidence, *or just an application of the mitigation factors*, this court cannot find [Conley's] culpability was diminished as a result of his age and/or applicable considerations of youth.

CP at 256 (emphasis added).  At the hearing, the court, after concluding the mitigating factors did not apply, went on to comment that "[t]his was a planned act of torture and the murder of an innocent man" and Conley, "based on his actions before, during, and after the murder, knew exactly what he was doing. . . .  [I]t was not impetuous, no peer pressure was involved, but was instead the person in control directing the actions, [and] knew exactly the risks and consequences, be it at the present time or the future."  RP (Dec. 9, 2022) at 16.  Consequently, the court "maintain[ed] its sentence of life without the possibility of parole."  RP (Dec. 9, 2022) at 16.

Conley appeals his sentence.

ANALYSIS

I.   CONLEY WAS NOT DENIED HIS RIGHT TO BE PRESENT AT THE "RESTRAINTS HEARING"

For the first time on appeal, Conley argues that the court violated his right to be present at the hearing where it determined if he would wear a stun cuff at his resentencing hearing. The State argues that the preliminary matter in determining Conley should be restrained does not implicate his right to be present. Alternatively, even if Conley had a right to be present, the State alleges that he waived appellate review by failing to object at the hearing. We conclude that Conley did not have a right to attend the restraint hearing. And even if he did, Conley waived appellate review.

Generally, courts do not consider issues raised for the first time on appeal. *State v. McFarland*, 127 Wn.2d 322, 332-33, 899 P.2d 1251 (1995); RAP 2.5(a). An issue, however, may be raised for the first time on appeal if there is (1) a "lack of trial court jurisdiction," (2) a "failure to establish facts upon which relief can be granted," or (3) a "manifest error affecting a constitutional right." RAP 2.5(a); *McFarland*, 127 Wn.2d at 332-33. "'Manifest' in RAP 2.5(a)(3) requires a showing of actual prejudice." *State v. Kirkman*, 159 Wn.2d 918, 935, 155 P.3d 125 (2007). Not all constitutional issues are subject to appellate review under RAP 2.5(a)(3). *See State v. Burns*, 193 Wn.2d 190, 210-11, 438 P.3d 1183 (2019); *State v. Anderson*, 19 Wn. App. 2d 556, 561-62, 497 P.3d 880 (2021), *abrogated on other grounds by State v. Schlenker*, 31 Wn. App. 2d 921, 553, P.3d 712 (2024).

Whether a defendant's constitutional right to be present has been violated is a question of law we review de novo. *State v. Irby*, 170 Wn.2d 874, 880, 246 P.3d 796 (2011). A criminal defendant has a fundamental right to be present at all critical stages of a proceeding under both the due process clause of the Fourteenth Amendment to the United States Constitution and article 1, section 22 of the Washington State Constitution. *Id.* A critical stage of a criminal proceeding is

12

one where a defendant's "'presence has a relation, reasonably substantial, to the fulness of [their] opportunity to defend against the charge.'" *Id.* (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 105-06, 54 S. Ct. 330, 78 L. Ed. 674 (1934), *overruled in part on other grounds sub nom. Malloy v. Hogan*, 378 U.S. 1, 84 S. Ct. 1489, 12 L. Ed. 2d 653 (1964)); *State v. Houston-Sconiers*, 188 Wn.2d 1, 29, 391 P.3d 409 (2017). "'The core of the constitutional right to be present is the right to be present when evidence is being presented.'" *State v. Slert*, 186 Wn.2d 869, 875, 383 P.3d 466 (2016) (quoting *In re Pers. Restraint of Lord*, 123 Wn.2d 296, 306, 868 P.2d 835 (1994)). This right, however, is not absolute. *Irby*, 170 Wn.2d at 881. A defendant "does not have a right to be present when his or her 'presence would be useless, or the benefit but a shadow.'" *Id.* (quoting *Snyder*, 291 U.S. 106-07).

Here, Conley's counsel made no mention of Conley's absence at the restraint hearing. And neither Conley nor his counsel made any mention of the issue at any other stage of his resentencing hearing. Conley's assignment of error does not implicate a constitutional right because a restraint hearing is not a critical stage of a criminal proceeding. This is so because all of the facts considered by the court were undisputed by the parties.[10] As a result, Conley's presence was unnecessary because there was no evidence being presented. *See Irby*, 170 Wn.2d at 880-81; *Slert*, 186 Wn.2d at 875. Consequently, there was no error because, on these facts, the restraints hearing was not a critical stage at which Conley was entitled to attend. But even if Conley had such a right, defense counsel waived Conley's presence.

Conley relies on *Bustamonte v. Eyman*, 456 F.2d 269, 274 (9th Cir. 1972), for the proposition that "[t]he right to be present is a personal constitutional right." Reply Br. of Appellant

---

[10] The court recognized that Conley was convicted of aggravated murder in the first degree in 2008 and was serving a life sentence, he had been infraction free since 2017, he was in minimum custody, and the courtroom was small and had a large audience in attendance.

at 3. As such, "defendant's counsel cannot waive the right, especially by silence." Reply Br. of Appellant at 3. Ninth Circuit precedent is only persuasive authority, and we are not persuaded by *Bustamonte*. *See State v. Pippin*, 200 Wn. App. 826, 837, 403 P.3d 907 (2017) ("[W]e *may* utilize well-reasoned, persuasive authority from federal courts and sister jurisdictions to resolve a question.") (emphasis added). Our Supreme Court has previously explained that the right to be present at all critical stages of a criminal proceeding can be waived by failing to object, and therefore, is not reviewable under RAP 2.5(a)(3). *Burns*, 193 Wn.2d at 211 (discussing cases which concluded that the right to be present may be waived by failure to object); *State v. Jones*, 185 Wn.2d 412, 426-28, 372 P.3d 755 (2016) (holding that the defendant waived his right-to-presence challenge by failing to raise a timely objection); *Slert*, 186 Wn.2d at 876 (holding that the defendant's "failure to timely object prevented" appellate review).

Even if it were the case that a defendant must personally waive their right to be present, Conley waived his right. Like *Slert* and *Jones*, Conley failed to object to his absence after arriving at court for the resentencing hearing. *See Jones*, 185 Wn.2d 416-20; *Slert*, 186 Wn.2d at 876. Therefore, even if this was a critical stage of the proceedings, we conclude that Conley waived appellate review of this issue.

II.     THE COURT DID NOT ABUSE ITS DISCRETION BY REQUIRING CONLEY TO WEAR A STUN CUFF AT HIS RESENTENCING HEARING

After concluding Conley waived review of his absence at the restraint hearing, we next address the court's determination that Conley needed to be restrained by a stun cuff. Conley argues that the court's decision to have him wear a stun cuff was an abuse of discretion. The State argues that the court properly considered the restraint factors articulated in *State v. Hartzog*, 96 Wn.2d 383, 635 P.2d 694 (1981), and did not abuse its discretion. And even if the court's decision was

14

an abuse of discretion, the error was harmless. We conclude that the court's decision to restrain Conley was not an abuse of discretion.

We review a trial court's decision to restrain a criminal defendant for an abuse of discretion. *State v. Jackson*, 195 Wn.2d 841, 850, 467 P.3d 97 (2020). "A trial court abuses its discretion when its 'decision is manifestly unreasonable, or is exercised on untenable grounds, or for untenable reasons.'" *Id.* (internal quotation marks omitted) (quoting *State v. Turner*, 143 Wn.2d 715, 724, 23 P.3d 499 (2001)).

A criminal defendant is entitled to a fair trial under the Sixth and Fourteenth Amendments to the United States Constitution and article I, section 22 of the Washington State Constitution. *Jackson*, 195 Wn.2d at 852. To ensure the right to a fair trial, "'[i]t is well settled that a defendant in a criminal case is entitled to appear at trial free from all bonds or [restraints] except in extraordinary circumstances.'" *Id.* (quoting *State v. Finch*, 137 Wn.2d 792, 842, 975 P.2d 967 (1999) (plurality opinion)). This constitutional right extends to nonjury pretrial hearings. *Jackson*, 195 Wn.2d at 852. "Restraints are viewed with disfavor because they may abridge important constitutional rights, including the presumption of innocence, privilege of testifying in one's own behalf, and right to consult with counsel during trial." *Hartzog*, 96 Wn.2d at 398.

"[T]he right to be free from restraint," however, "is not absolute, and trial court judges are vested with [broad] discretion to determine measures that implicate courtroom security, including whether to restrain a defendant in some capacity in order to prevent injury." *Jackson*, 195 Wn.2d at 852; *Hartzog*, 96 Wn.2d at 401. In exercising its discretion, "[a] trial court *must* engage in an individualized inquiry into the use of restraints prior to every court appearance." *Jackson*, 195 Wn.2d at 854. This inquiry "'must be founded upon a factual basis set forth in the record.'" *Id.*

15

at 853 (quoting *Hartzog*, 96 Wn.2d at 400). The trial court should consider the following factors

before ordering the use of restraints in the courtroom:

> [T]he seriousness of the present charge against the defendant; defendant's temperament and character; his age and physical attributes; his past record; past escapes or attempted escapes, and evidence of a present plan to escape; threats to harm others or cause a disturbance; self-destructive tendencies; the risk of mob violence or of attempted revenge by others; the possibility of rescue by other offenders still at large; the size and mood of the audience; the nature and physical security of the courtroom; and the adequacy and availability of alternative remedies.

*Jackson*, 195 Wn.2d at 853 (internal quotation marks omitted) (quoting *State v. Hutchinson*, 135

Wn.2d 863, 887-88, 959 P.2d 1061 (1998)). A trial court abuses its discretion and commits

constitutional error by requiring a defendant to be restrained without an individualized inquiry into

its need. *Jackson*, 195 Wn.2d at 855. Restraints should "'be used only when necessary to prevent

injury to those in the courtroom, to prevent disorderly conduct at trial, or to prevent an escape.'"

*Finch*, 137 Wn.2d at 846 (quoting *Hartzog*, 96 Wn.2d at 398).

Here, the court required Conley to wear a stun cuff at his resentencing hearing. The court

came to this conclusion after determining that the hearing was in a small courtroom that was "very

packed" and "safety [was] of the upmost concern to the court." RP (Oct. 28, 2022) at 5-6. This

was not manifestly unreasonable or based on untenable grounds, so the decision was not an abuse

of discretion. Unlike existing precedent relied on by Conley, the court conducted an individualized

analysis, referencing the restraint factors in *Hartzog*. *Jackson*, 195 Wn.2d at 855 (holding that the

court abused its discretion by requiring "Jackson to be shackled under a blanket jail policy at his

pretrial proceedings without an individualized inquiry into its need."); *State v. Luthi*, 3 Wn.3d

249, 263, 549 P.3d 712 (2024) (holding that the court's failure to "engage in an individualized

inquiry before requiring Luthi appear from the in-court holding cell for her hearing" amounted to

constitutional error).

16

Therefore, we conclude that the court did not abuse its discretion by requiring Conley to wear a stun cuff at the resentencing hearing.

III.    ARTICLE 1, SECTION 14 OF THE WASHINGTON STATE CONSTITUTION DOES NOT PROSCRIBE DISCRETIONARY LWOP FOR YOUNG ADULTS BETWEEN THE AGES 18-20

Conley challenges the constitutionality of RCW 10.95.030(1), arguing that discretionary LWOP for young adults between the ages of 18 and 20 is prohibited under article 1, section 14 of the Washington State Constitution. The State argues that such practice is constitutional. We agree with the State.

Article 1, section 14 of the Washington State Constitution prohibits "cruel punishment." And the Eighth Amendment to the United States Constitution protects a criminal defendant from "cruel and unusual punishments."

We review the constitutionality of a statute de novo. *State v. Bassett*, 192 Wn.2d 67, 77, 428 P.3d 343 (2018). "We presume statutes are constitutional," and the defendant "has the burden to prove otherwise beyond a reasonable doubt." *Id.*

A       Background

Juvenile sentencing has been a rapidly changing area of the law. In 2005, the United States Supreme Court barred the death penalty for defendants "under the age of 18 when their crimes were committed." *Roper v. Simmons*, 543 U.S. 551, 578, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005). And in 2010, it held unconstitutional life sentences without parole for nonhomicide offenses as violative of the Eighth Amendment. *Graham v. Florida*, 560 U.S. 48, 74, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010). In *Graham*, the Court noted that "[l]ife without parole is an especially harsh punishment for a juvenile," because "[u]nder this sentence a juvenile offender will on average serve more years and a greater percentage of [his or her] life in prison than an adult offender." *Id.*

at 70. And such a sentence was "not appropriate in light of a juvenile nonhomicide offender's capacity for change and limited moral culpability." *Id.* at 74.

In *Miller v. Alabama*, 567 U.S. 460, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012), the Supreme Court went a step further. The Court held unconstitutional *mandatory* life without parole for juvenile homicide offenders because it denied consideration of a defendant's "chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences." *Id.* at 477. Consequently, the Court explained that in order to impose LWOP, "a judge or jury must have the opportunity to consider mitigating circumstances before imposing the harshest penalty possible for juveniles," leaving open the possibility of *discretionary* LWOP. *Id.* at 489.

In 2017, our Supreme Court adopted the reasoning in *Miller*, explaining that "sentencing courts must have complete discretion to consider mitigating circumstances associated with the youth of any juvenile defendant, even in the adult criminal system." *Houston-Sconiers*, 188 Wn.2d at 21. And in 2018, our Supreme Court went even further. In *Bassett*, the court imposed a categorical bar on LWOP, both mandatory and discretionary, for juveniles. 192 Wn.2d at 90. Our Supreme Court explained that because "states are rapidly abandoning juvenile life without parole sentences, children are less criminally culpable than adults, and the characteristics of youth do not support the penological goals of a life without parole sentence," RCW 10.95.030 constituted "cruel punishment" under article 1, section 14 of the Washington State Constitution. *Id.*

Up until 2021, defendants between the ages of 18 and 20 were treated as adults under RCW 10.95.030, meaning they were subject to mandatory LWOP for aggravated murder in the first degree. That changed in *Monschke*, as our Supreme Court held unconstitutional mandatory LWOP for young adults. 197 Wn.2d at 326. The court's holding was premised on the understanding "that

no meaningful neurological bright line exists between age 17 and age 18." *Id.* As a result, it was imperative that "sentencing courts must have discretion to take the mitigating qualities of youth— those qualities emphasized in *Miller and Houston-Sconiers*—into account for defendants younger and older than 18." *Id.* at 326. The court in *Monschke*, however, noted that "[n]ot every 19- and 20-year-old will exhibit these mitigating characteristics." *Id.* Consequently, the court left "it up to sentencing courts to determine which individual defendants merit leniency for the" characteristics of youth. *Id.* The court later explained that *Monschke* did not stand for a categorical bar of LWOP for young adults; rather, it was adopting a similar framework articulated in *Miller*. *In re Pers. Restraint of Kennedy*, 200 Wn.2d 1, 23, 513 P.3d 769 (2022).

B.    Courts in Washington Have Rejected a Categorical Bar on LWOP for Young Adults

RCW 10.95.030(1) provides, in part, that

> [A]ny person convicted of the crime of aggravated first degree murder shall be sentenced to life imprisonment without possibility of release or parole. A person sentenced to life imprisonment under this section shall not have that sentence suspended, deferred, or commuted by any judicial officer and the indeterminate sentence review board or its successor may not parole such prisoner nor reduce the period of confinement in any manner whatsoever including but not limited to any sort of good time calculation. The department of social and health services or its successor or any executive official may not permit such prisoner to participate in any sort of release or furlough program.

Under current precedent, a defendant between the ages of 18 and 20 who is found guilty of aggravated murder in the first degree cannot be sentenced to *mandatory* LWOP. *Monschke*, 197 Wn.2d at 326. They can, however, be sentenced to *discretionary* LWOP if the sentencing court, after considering the characteristics of youth and other factors, determines that LWOP is warranted. *Id.*

Efforts to extend *Monschke* have been previously considered and rejected by this court. *See State v. Kreuger*, 28 Wn. App. 2d. 549, 540 P.3d 126 (2023), *review denied*, 2 Wn.3d 1034

(2024); *State v. Lauderdale*, No. 39441-7-III, (Wash. Ct. App. June 13, 2024) (unpublished), http://www.courts.wa.gov/opinions.pdf, *review denied*, 3 Wn.3d 1031 (2024). This is based on the fact *Monschke* recognized that "[n]ot every 19- and 20-year old" exhibits the mitigating characteristics of youth. 197 Wn.2d at 326. And our Supreme Court reiterated that *Monschke* did not conclude "LWOP is categorically barred for young adults" and stated that *Monschke* did not announce a decision similar to *Bassett*. *Kennedy*, 200 Wn.2d at 23.

A categorical bar of LWOP for defendants like Conley undercuts the reasoning of *Monschke*. While it may be true "that no meaningful neurological bright line exists between," a juvenile and a young adult, the court in *Monschke* acknowledged that not every young adult will exhibit the mitigating characteristics articulated in *Miller*. 197 Wn.2d at 326. This illustrates the necessity to maintain discretionary LWOP: allowing sentencing courts to consider each defendant's situation and determine whether such a sentence is or is not warranted. Because existing precedent is dispositive of this issue, efforts to extend *Bassett* to young adults must be resolved by our Supreme Court.

Therefore, we conclude that article 1, section 14 of the Washington State Constitution does not proscribe *discretionary* LWOP for defendants between the ages of 18 and 20.[11]

IV.   ARTICLE 1, SECTION 14 OF THE WASHINGTON STATE CONSTITUTION DOES NOT PROHIBIT LWOP FOR DEFENDANTS WHO HAVE A CHANCE OF REHABILITATION

Relying on *State v. Haag*, 198 Wn.2d 309, 495 P.3d 241 (2021), Conley also argues that LWOP is unconstitutional for young adult defendants who have the possibility of rehabilitation. The State argues that *Haag* is inapplicable because the case dealt solely with juvenile offenders,

---

[11] Because *Monschke* is dispositive on the issue, we decline to conduct the categorical bar analysis to determine whether article 1, section 14 of the Washington State Constitution prohibits discretionary LWOP for young adults.

and such a holding would "undercut well settled law requiring . . . courts [to] consider a multitude of factors" surrounding a defendant's circumstances. Br. of Resp't at 44. We agree with the State.

In *Haag*, our Supreme Court considered the constitutionality of a de facto life sentence imposed on a juvenile under former RCW 10.95.030(3) (2015). 198 Wn.2d at 313. Ultimately, the court reversed Haag's sentence because the resentencing court placed too much "emphasis on retributive factors than on mitigation factors." *Id.* at 330. The court explained that among the "mitigating qualities of youth and its attendant circumstances," resentencing courts must "also 'consider the measure of rehabilitation that has occurred *since* a youth was originally sentenced to life without parole.'" *Id.* at 322 (emphasis in original) (quoting *State v. Delbosque*, 195 Wn.2d 106, 122, 456 P.3d 806 (2020)). Consequently, "*Miller*-fix hearings must be forward looking, not backward looking," and the "'key question is whether the [juvenile] defendant is capable of change.'" *Id.* at 322-23 (alteration in original) (quoting *Delbosque*, 195 Wn.2d at 122).

*Haag*, however, is not applicable. Conley does not fall within the same provision considered in *Haag* because he was a young adult (20) at the time of the offense; instead, his resentencing is governed by the nonstatutory, constitutional factors set forth in *State v. Ramos*, 187 Wn.2d 420, 387 P.3d 650 (2017). Under *Ramos*, a sentencing court "must meaningfully consider how juveniles are different from adults" and "how those differences apply to the facts of the case." 187 Wn.2d at 434-35. While "*Miller* requires courts to consider the *capacity* for rehabilitation when making an initial sentencing decision," *id.* at 449, "they must also consider the facts of the particular case, including those that counsel in favor of punishment," *Anderson*, 200 Wn.2d at 286. And "evidence of *actual* 'demonstrated maturity and rehabilitation'" is left to "the discretion of the trial court in each case." *Ramos*, 187 Wn.2d at 449 (internal quotation marks omitted) (quoting *Miller*, 567 U.S. at 479).

21

Therefore, we conclude that *Haag* is inapplicable, and article 1, section 14 of the Washington State Constitution does not prohibit LWOP for *young adults* when there is a "chance" of rehabilitation.

V.    THE COURT PROPERLY CONSIDERED ALL MITIGATING FACTORS

Conley argues that the court improperly weighed retribution over other mitigating factors, including rehabilitation. The State claims that the court properly considered all factors and acted within its discretion. We conclude that the court properly considered all factors and did not abuse its discretion.

We review a sentencing court's decision for an abuse of discretion. *State v. Carter*, 3 Wn.3d 198, 212, 548 P.3d 935 (2024). "A trial court abuses its discretion when its 'decision is manifestly unreasonable, or is exercised on untenable grounds, or for untenable reasons.'" *Jackson*, 195 Wn.2d at 850 (internal quotation marks omitted) (quoting *State v. Turner*, 143 Wn.2d 715, 724, 23 P.3d 499 (2001)). "Untenable grounds consist of factual findings that are unsupported by the record." *Carter*, 3 Wn.3d at 212. Factual findings are reviewed for substantial evidence, "which 'exists where there is a sufficient quantity of evidence in the record to persuade a fair-minded, rational person of the truth of the finding.'" *Haag*, 198 Wn.2d at 317 (internal quotation marks omitted) (quoting *Delbosque*, 195 Wn.2d at 116).

As previously explained, at resentencing, a court must "meaningfully consider" numerous factors. *Ramos*, 187 Wn.2d at 434-35. Among them include those articulated in *Miller* and *Houston-Sconiers*, including "'immaturity, impetuosity, and failure to appreciate the risks and consequences,' as well as 'the nature of the juvenile's surrounding environment and family circumstances, the way familial and peer pressures may have affected them, and any factors suggesting that the child might be successfully rehabilitated.'" *Carter*, 3 Wn.3d at 221 (internal

quotation marks omitted) (quoting *Houston-Sconiers*, 188 Wn.2d at 23). While "[c]ourts must 'consider the *capacity* for rehabilitation when making an initial sentencing decision' involving LWOP, . . . 'evidence of *actual* demonstrated maturity and rehabilitation is generally considered later,'" and within the discretion of trial courts. *Id.* (internal quotation marks omitted) (quoting *Ramos*, 187 Wn.2d at 449). "While sentencing courts must focus on these mitigating qualities of youth, they must also consider the facts of the particular case, including those that counsel in favor of punishment." *Anderson*, 200 Wn.2d at 286.

A.      The Court's Findings of Fact Were Supported by Substantial Evidence[12]

Conley argues that finding of fact 11, dealing with the consideration of the youthful characteristics, was inconsistent with the evidence. We conclude that the court's findings were supported by substantial evidence.

The court first concluded that Conley's actions were not impetuous. The facts in the record support this conclusion. The events of March 31, 2006 were not the product of an impulsive, hastily executed decision. As noted by the court, Conley burglarized his father's boat three days prior, taking weapons that were ultimately used to kill Swehla. And Swehla was no stranger to Conley; there was an existing relationship between the two, and Conley knew that there was a safe in the residence. These facts support the notion that Conley's efforts were thought out in advance, not impetuous.

Next, the court concluded that there was "no showing of peer pressure." CP at 254. Again, the record supports this conclusion. Throughout all stages, there was no indication that anyone

---

[12] There was no dispute over the court's finding that Conley fit "within the age range to be considered," and there were no mitigating circumstances regarding legal defenses. CP at 254.

was exerting pressure over Conley to commit this crime. Instead, it was Conley leading the way. And ultimately, it was Conley, not Childers, who killed Swehla.

The court then determined that Conley's age did not "impact[] his ability to appreciate the risks and consequences of his actions." CP at 254. The record supports this conclusion. The days following Swehla's death are of particular relevance here. After killing Swehla, Conley destroyed evidence connecting him to the crime. He got rid of his clothes and attempted to burn the used shotgun shells. He tried to get rid of the weapons. He also warned Zebley of the fact that he would not want his truck back because Conley used it to commit a burglary. Conley even suggested that he needed to tie up loose ends, referring to Childers, as Childers was the only eye-witness to the murder.

In sum, the findings of the court that the youthful characteristics did not affect Conley's actions on the day of the offense were supported by substantial evidence.

B.      The Court Properly Considered All Mitigating Factors and Did not Abuse its Discretion

In the court's findings of fact and conclusions of law, the court recognized all of the factors that needed to be considered.[13] The court considered Carter's opinion that Conley was not "functioning as a fully developed responsible adult," and was affected by his youthful characteristics. RP (Oct. 28, 2022) at 42. The court acknowledged Conley faced "many challenges as a youth growing up." CP at 255. The court also considered all of the testimony and supporting statements regarding Conley's rehabilitative efforts during confinement. And the court considered

---

[13] The court considered "youth and its hallmark features" (immaturity, impetuosity, and failure to appreciate risks and consequences), Conley's "surrounding environment and family circumstances, the extent of the person's participation in the crime, the way familial and peer pressures may have affected him, and how youth impacted any legal defense, along with factors suggesting there might be successful rehabilitation." CP at 251.

the underlying facts of the case. Again, rehabilitation is not the sole factor for a court to consider. *See Ramos*, 187 Wn.2d at 434-35; *Anderson*, 200 Wn.2d at 286. The court concluded that the mitigating factors did not warrant a lower sentence, which was a decision within its discretion.[14]

Therefore, we conclude that the court properly considered all mitigating factors and did not abuse its discretion.

VI.    THE COURT DID NOT ERR REGARDING THE BURDEN OF PROOF BECAUSE IT DETERMINED THAT LWOP WAS APPROPRIATE UNDER EITHER FRAMEWORK

Conley argues that the court erred by treating LWOP "as the presumptive sentence" and requiring him to prove mitigating factors beyond a preponderance of the evidence. Br. of App. at 33-37. Relatedly, in his reply brief, Conley asserts that the court failed to consider that it had the discretion to impose a sentence ranging from zero days to LWOP under our Supreme Court's recent decision in *Carter*. Rep. Br. of App. at 6. The State argues that the court applied the correct standard, and in the alternative, the State also asserts that the court correctly concluded that LWOP was appropriate under either standard. We conclude the court did not err by requiring Conley to prove mitigating factors by a preponderance of the evidence because it also considered the factors with no burden (as in any other sentencing). Also, we conclude that even though the court did not have the benefit of knowing it could impose a sentence of zero days to LWOP, it properly concluded that LWOP was warranted.

---

[14] For example, the court determined that Carter's opinion did not shed light on how Conley was affected by his youthful characteristics at the time of the offense because Carter lacked knowledge of the underlying facts. This was within the court's discretion. *See Kreuger*, 28 Wn. App. 2d at 560 (explaining that "[t]here is no requirement that the court agree with the expert witness" regarding the impact of youthfulness on a defendant). Also, the court referenced the fact that just two years earlier, Conley disputed his guilt in a PRP. This was a reasonable factor for the court to consider with respect to Conley's sincerity towards his rehabilitation and accountability for the crime. *See Ramos*, 187 Wn.2d at 449 ("[E]vidence of actual 'demonstrated maturity and rehabilitation'" is within a court's discretion to consider) (internal quotation marks omitted) (quoting *Miller*, 567 U.S. at 479) (emphasis omitted).

We review a sentencing court's decision for an abuse of discretion. *Carter*, 3 Wn.3d at 212. "An appellate court will reverse a sentencing court's decision only if it finds a clear abuse of discretion or misapplication of the law." *State v. Porter*, 133 Wn.2d 177, 181, 942 P.2d 974 (1997).

Courts have placed the burden to establish mitigating factors on the defendant when they are seeking an exceptional sentence. In *Ramos*, for example, our Supreme Court explained that defendants seeking resentencing had to establish mitigating factors beyond a preponderance of the evidence to support that "substantial and compelling reasons . . . justify an exceptional sentence." 187 Wn.2d at 435. This holding was reiterated in subsequent cases. *State v. Gregg*, 196 Wn.2d 473, 482, 474 P.3d 539 (2020) ("We have held that trial courts, when sentencing juveniles, have discretion to impose a sentence below the standard range and may, where required, disregard mandatory enhancements when supported by evidence presented at sentencing as to mitigating qualities of youth."); *Anderson*, 200 Wn.2d at 285 ("[A] juvenile offender must show that their immaturity, impetuosity, or failure to appreciate risks and consequences—characteristics of youth that suggest a juvenile offender may be less culpable than an adult offender—contributed to the commission of their crime.").

Before *Monschke*, the only possible sentence for young adults convicted of aggravated murder in the first degree was mandatory LWOP. 197 Wn.2d at 308. Of course, this changed, and sentencing courts were afforded more discretion. *See id.* at 329; *Carter*, 3 Wn.3d at 216. And in *Carter*, our Supreme Court made clear that after *Monschke*, the available range for aggravated assault in the first degree for young adults was zero days in confinement to LWOP. *Carter*, 3 Wn.3d at 216.

26

As here, when a court grants a CrR 7.8 motion, it "has the effect of vacating the original" judgment and sentence. *State v. Vasquez*, ___ Wn.3d ___, 560 P.3d 853, 856 (2024). Consequently, "'until the trial court exercise[s] its independent judgment by imposing a new judgment and sentence, there is 'no sentence,' and . . . the resentencing order 'effectively vacat[es] the judgment.'" *Id.* at 856 (internal quotation marks omitted) (quoting *State v. McWhorter*, 2 Wn.3d 324, 328, 535 P.3d 880 (2023)). Because of this, a court at resentencing has broad discretion that "can be exercised either for or against" the defendant. *Id.* at 857.

In light of the doubts raised by Conley's defense counsel at resentencing regarding the burden of proof, the court analyzed the issue under two frameworks: one that placed the burden on the defendant, and the other where it considered the factors without any burden. With the understanding of *Carter*, and the fact that Conley moved to be resentenced pursuant to CrR 7.8, it is now apparent that the court had broad discretion to impose a sentence ranging from zero days to LWOP. *Carter*, 3 Wn.3d at 216; *Vasquez*, 560 P.3d at 856. Had the court relied solely on the preponderance standard, that would have been error. This is so because there is no such thing as an exceptional sentence in this instance. *See Carter*, 3 Wn.3d at 216.

But that is not what happened here. Critically, the court explained that it felt that LWOP was appropriate under either standard. Specifically, the court said:

> [Conley] has not demonstrated by a preponderance [of the evidence] that his crime reflects the mitigating qualities of youth. There are no substantial and compelling reasons to justify an exceptional sentence. *Even if it was just the consideration of mitigating factors, the Court still finds no basis when considering all the various factors to mitigate the sentence.* Quite the opposite.

RP (Dec. 9, 2022) at 15-16 (emphasis added). Because the court analyzed the factors under both standards, the court acknowledged it could have the discretion to impose a sentence less than LWOP. In fact, Conley's attorney argued, correctly as it turned out, that after *Monschke*, courts

had the authority to resentence a defendant from zero days to LWOP. And even with that understanding, the court declined to do so. By considering the factors and acknowledging the authority to impose a sentence less than LWOP, the court made its decision in line with the proper framework articulated in *Carter*, 3 Wn.3d at 216. As a result, the court's decision does not amount to an abuse of discretion because it was based on either standard, one of which was correct.

Therefore, we conclude that even though the court did not have the benefit of *Carter*, it did not abuse its discretion by sentencing Conley to LWOP because the court considered the mitigating factors under both frameworks and was aware it could give a sentence less than LWOP.

VII.    THE COURT DID NOT ERR IN FAILING TO CONSIDER AN INDETERMINATE SENTENCE

Conley argues that the court erred by not considering an indeterminate sentence, abusing its discretion. The State disagrees, arguing that *Carter* prohibits a court from imposing an indeterminate sentence. We agree with the State.

In *Carter*, our Supreme Court considered the indeterminate sentences of two young adult defendants. 3 Wn.3d at 214-15. The court ultimately concluded that the only sentence available for young adults sentenced under RCW 10.95.030 is a determinate sentence of zero days to LWOP. *Id.* at 216. This was based, in part, on the fact that an indeterminate sentence was unworkable as "Washington is a state largely without parole." *Id.* at 214.

Therefore, we conclude that the court did not err in not considering an indeterminate sentence.

## CONCLUSION

Accordingly, we affirm Conley's sentence.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Veljacic, A.C.J.

We concur:

Maxa J.

Price, J.